Tjark BATEMAN and Ann Bateman, Plaintiffs,

v.

317 REHOBOTH AVENUE, LLC, and Reed Real Estate, LLC, Defendants.

C.A. No. 877–S.

Court of Chancery of Delaware. New Castle County.

Submitted: June 8, 2005.
Decided: July 19, 2005.

Tasha Marie Stevens, Esquire, FUQUA AND YORI, P.A., Georgetown, Delaware, Attorney for Plaintiffs.

Noel E. Primos, Esquire, SCHMIT-TINGER & RODRIGUEZ, P.A., Dover, Delaware, Attorney for Defendants.

## OPINION

STRINE, Vice Chancellor.

This case presents the question of whether a right of first refusal to purchase a leased property survives the termination of that lease. Here, a lessee whose lease terminated by its terms continued to occupy the leased property as a month-to-month holdover tenant. The version of Delaware's holdover tenancy statute, 25 Del. C. § 5108, that controlled the lease states that "stipulations" of a "rental agreement" carry over into a holdover tenancy. Although the expired lease provided the lessee a right of first refusal, the landlord sold the property to a third party during the holdover tenancy without informing the lessee. The lessee now seeks rescission of that sale, arguing that, under the right of first refusal provision, the property could not be sold to a third party without the approval of the lessee. The lessee also seeks, pursuant to the right of first refusal, to purchase the property on the same terms offered to the third party.

I find that a right of first refusal is not a provision of a rental agreement that concerns the "use and occupancy" of rental property, and is therefore not a term of a rental agreement that, under § 5108, survives the termination of a lease and remains in force during a holdover tenancy. Statutory holdover tenancies are narrowly designed to maintain the status quo of a tenant's use of leased property following the expiration of a lease and to defuse the pressure for immediate expulsion of tenants after expiration that existed under common law, and should not be read broadly to override the clear expiration of terms of a commercial lease that are unrelated to use and occupancy of leased prop-erty. The precise definition of "rental agreement" used by the General Assembly reinforces the narrow purpose of the holdover tenancy by focusing directly on "use and occupancy," neither of which is impli-cated by a separate right of first refusal to purchase property.

And, for reasons I discuss, to interpret § 5108 as the lessees advocate would im-plement no discernable policy objective of the General Assembly. To adopt the les-see's view would simply encourage land-lords to seek eviction earlier in order to avoid the perverse consequence of perpet-uating—by tolerating a tenant at suffer-ance—an otherwise expired restriction on their ability to alienate their real property. For all these reasons, I conclude that the lessee here is not entitled to exercise her right of first refusal during her holdover tenancy, because that right was extin-guished when the lease terminated.

### I. Factual Background

The undisputed facts of this case, as drawn from the pleadings, are as follows.

The plaintiffs in this case, Tjark and Ann Bateman ("the Batemans"), dispute their rights under a written lease agree-ment executed on December 31, 1996 (the "Lease") for a commercial property locat-ed at 319 Rehoboth Avenue, Rehoboth Beach, Delaware (the "Property"). The Property was originally leased to the Bate-mans by one of the co-defendants in this case, Reed Real Estate, LLC. Reed Real Estate transferred its interest in the Prop-erty to the second co-defendant, 317 Reho-both Avenue, LLC, in January 2004. Peering beneath the corporate entities in-volved, that transaction effectively trans-ferred control of the Property from Joseph Reed, of Reed Real Estate, to his brother Robert Reed, of 317 Rehoboth Avenue.

The present dispute flows out of two provisions of the Lease: an Option to Extend and a Right of First Refusal. The initial term of the Lease was three years, beginning on January 1, 1997, and ending on December 31, 1999. Under the Option to Extend provision, the Batemans were entitled to extend the lease for up to four additional three-year terms, for a maximum occupancy of fifteen years. Paragraph 8 of the Lease required that the Batemans notify Reed Real Estate of their intent to extend the Lease in writing, at least sixty days before the expiration of each three-year term. Under the Right of First Refusal, Reed Real Estate was required to give the Batemans written notice of its intent to sell the Property, along with a copy of any proposed contract of sale. The Batemans would then be permitted to either approve the transaction, or purchase the property on the same terms provided under the proposed contract of sale.

The Batemans took possession of the Property in January 1997 and, after renovations, operated a home and accessory gift store, Ann Bateman, Limited, on the premises. The first six years of the Batemans' occupancy under the Lease passed, seemingly, without contention. Although under the terms of the Lease, the Batemans had to renew the Lease in writing by November 1, 1999, they failed to exercise the Option to Extend. Nevertheless, the parties continued to operate under the Lease as if it had been renewed. Similarly, on November 1, 2002, the Batemans neglected to renew the Lease in writing. In January 2003, the Batemans' landlord, Joseph Reed of Reed Real Estate, informed the Batemans that their Lease had terminated. Specifically, Joseph noted that the Lease terminated on December 31, 1999, when the Batemans first failed to renew the Lease in writing.

The Batemans, never having intended to let the Lease lapse, sought to reach an agreement that would permit them to continue renting the Property on the same terms they had enjoyed under the Lease. In a letter dated February 24, 2003, Joseph informed the Batemans of an increase in monthly rent, but specified no other terms of their occupancy of the property. No new lease was executed at that time, but the Batemans continued to occupy the Property.

Reed Real Estate transferred its ownership of the Property to 317 Rehoboth Avenue in January 2004. Soon thereafter, Robert Reed, Joseph Reed's brother and the managing member of 317 Rehoboth Avenue, again informed the Batemans that their Lease had terminated. The Batemans again sought to reach an agreement to extend their occupancy of the Property, but were unsuccessful. On May 12, 2004, 317 Rehoboth Avenue informed the Batemans that they would be required to vacate the Property by July 31, 2004.

The Batemans failed to vacate the premises and on August 2, 2004, 317 Rehoboth Avenue filed an action seeking to recover possession of the Property with the Justice of the Peace Court of Sussex County. The court found for the Batemans and 317 Rehoboth Avenue appealed.

On October 29, 2004, a three-judge panel of the Justice of the Peace Court reversed the original decision favoring the Batemans and awarded possession of the Property to 317 Rehoboth Avenue. The court found that the Lease terminated, by its terms, on December 31, 2002, and that after that date, the Batemans' tenancy was a holdover tenancy governed by 25 *Del. C.* § 5108. The court further found that 317 Rehoboth Avenue properly ordered the Batemans to vacate the premises on May 12, 2004. On November 17, 2004, the

court issued a writ of possession in favor of 317 Rehoboth Avenue.

On November 19, 2004, the Batemans filed this action seeking, pursuant to the terms of the original Lease, to enforce their Right of First Refusal, and filed a motion for a temporary restraining order enjoining the writ of possession and preventing 317 Rehoboth Avenue from evicting them from the Property. I denied the motion for a temporary restraining order on November 22, 2004. On November 23, 2004, a constable of the Sussex County Justice of the Peace Court enforced the writ of possession, terminating the Batemans' possession of the Property and placing 317 Rehoboth Avenue in possession of the Property.

On January 5, 2005, the defendants moved for judgment on the pleadings, arguing that the Right of First Refusal did not continue in effect after the termination of the Lease on December 31, 2002, and cannot now be enforced.[1]

## II. Legal Analysis

■ A motion for judgment on the pleadings may be granted when, viewing all facts and drawing all inferences in favor of the non-moving party, no material issue of fact is found to exist and the moving party is entitled to judgment as a matter of law.[2] The relevant facts of this case are not in dispute. The Justice of the Peace Court rejected the Batemans' arguments that the Lease had been effectively renewed and was still in force, and, moreover, that they would have the right to continue to use the Option to Extend provision and, by exercising up to five three-year renewals, to prolong the Lease until its final termination on December 31, 2011. Instead, the court held that the Lease ended on December 31, 2002.[3]

■ The determination of the Justice of the Peace Court that the Lease terminated on December 31, 2002 was obviously necessary to its final judgment awarding possession of the Property to 317 Rehoboth Avenue: absent a finding that the Lease had ended, the Court could not have awarded possession. That finding is therefore binding on the Batemans under the doctrine of collateral estoppel, as they concede.[4] The

1. Alternatively, the defendants argue that the doctrine of laches bars the enforcement of the Right of First Refusal at this late date. Because I conclude that the Right of First Refusal did not survive the termination of the Lease, I need not reach the laches argument.

2. See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P., 624 A.2d 1199, 1205 (Del.1993).

3. See 317 Rehoboth Avenue, LLC v. Bateman, C.A. No. J0408013117 (Del. J.P. Ct., Oct. 29, 2004).

4. Language from the October 29, 2004 opinion of the Justice of the Peace Court, states, with reference to 25 Del. C. § 5108, that: "the Court finds that the lease terminated by its own terms on December 31, 2002 . . . ." In the opinion, the Court also noted that the Lease's "provisions (other than term) continued in effect on a month-to-month basis by operation of law." See id. at 4. Although the Batemans have played it cute at times on this question, the Batemans now concede that this language was merely descriptive dictum, and has no bearing on the question now before this court. The Batemans never argued before the Justice of the Peace Court that they were entitled to retain possession of the Property because the Right of First Refusal provision continued in force during the pendency of the holdover tenancy per § 5108, and that they should therefore continue to possess the Property until they had an opportunity to buy under that Right and refused to do so. Indeed, the Right of First Refusal provision was never raised before the Justice of the Peace Court at all. The Batemans clarified during oral argument that they are not pressing any collateral estoppel argument that the descriptive dictum from the Justice of the Peace Court's decision referred in any way to their Right of First Refusal. See June 8, 2005 Tr. at 34. They are bound by that concession.

only issue that remains to be considered is a matter of law: whether the Right of First Refusal provided under the original Lease continued in effect when the Batemans failed to renew the Lease and continued to rent the Property on a month-to-month basis.

The Batemans now argue that the Right of First Refusal survived the termination of the Lease on December 31, 2002. In support of that position, they look to the language of 25 *Del. C.* § 5108, which creates a statutory month-to-month holdover tenancy that automatically takes effect when a lease is not renewed. Specifically, the Batemans cite language from the pre-1996 version of § 5108, which is the version that governs the Lease.[5] That statute states that when the original term of a lease expires without renewal or termination and a holdover tenancy ensues, "the term shall be by the month and all other stipulations of the rental agreement shall continue in force and effect." The Batemans argue that, under this language, the Right of First Refusal is a "stipulation" that continued in force and effect after the Lease terminated. Accordingly, the Batemans say, they remain entitled during their holdover tenancy to exercise their Right of First Refusal, to seek rescission of the sale of the Property by Reed Real Estate to 317 Rehoboth Avenue, and to purchase the Property on the same terms.

There is no statutory definition of "stipulation" applicable to § 5108 that buttresses the Batemans' reading. Section 5102 of the pre-1996 Landlord–Tenant Code provides statutory definitions of terms applicable to the Code, including § 5108. But § 5102 does not provide a definition for the term "stipulation." It does, however, contain another definition that bears importantly on this dispute. Under § 5102, the term "rental agreement" is defined as "all agreements, written or oral, which establish or modify the terms, conditions, rules, regulations or any other provisions concerning the *use and occupancy* of a rental unit."[6]

The Batemans' argument depends on the court's adoption of a broad reading of the statutory definition of rental agreement under § 5102. A broad reading would place the greatest emphasis on the word "all," such that *all* provisions of a lease comprise the rental agreement, regardless of whether those provisions pertain to use and occupancy of leased property. That broad reading, as applied to § 5108, would permit *all* terms of the original Lease, including the Right of First Refusal, to survive into the Batemans' holdover tenancy.

The interpretation of § 5102 that the Batemans advocate does not necessarily follow from a plain reading of the statutory text. The definition of the term "rental agreement" under § 5102 can also be reasonably read as including only those provisions that focus specifically on the "use and occupancy of a rental unit." That interpretation focuses more narrowly on the relationship between a tenant and the property she occupies, as opposed to relationships between the lessor and the lessee. That narrower reading of "rental

---

**5.** The Batemans' Lease is governed by 25 *Del. C.* § 5108 as it existed before the General Assembly enacted major revisions to the Landlord–Tenant Code in 1996. Before the 1996 revisions, the Landlord–Tenant Code applied to both residential and commercial leases. After the revisions took effect, the Landlord–Tenant Code applied only to residential leases, and commercial leases were governed by a separate chapter of Title 25. As will be discussed later, § 5108 as it exists today does not govern commercial leases, and to that extent, the present dispute is something of a historical anomaly.

**6.** Emphasis added.

agreement," as applied to § 5108, would subject the Batemans' holdover tenancy to terms of the Lease that govern the use and occupancy of the Property, but would not permit the survival of the Right of First Refusal beyond the termination of the Lease.

Both the broader reading advocated by the Batemans and the narrower reading advocated by the defendants are, in my view, plausible interpretations of the language of the statute. The Batemans contend that prior, albeit non-binding, judicial precedent supports their reading and that I should defer to prior judicial findings on the subject.

To that effect, the Batemans have cited two Delaware cases, *Old Time Petroleum v. Turcol*[7] and *Emmett S. Hickman Co. v. American Realty*,[8] which considered the effect of termination of a lease on the exercise of an option to purchase property in light of statutory predecessors to § 5108. Neither of those cases explicitly held that options to purchase property survive the termination of the lease that granted the option or, more to the point here, that such options could be exercised during a holdover tenancy.

The *Turcol* court considered an option to purchase property that was exercised by a tenant during the term of the lease, but the actual purchase of which was to be concluded one day after the termination of the lease, during a holdover tenancy.[9] The court did not address the very different issue of whether the option could be exer-cised during the holdover tenancy when the option itself had contractually expired.

The *Hickman* court considered whether a real estate broker who introduced a lessee to a lessor was entitled to a brokerage fee when the lessee later purchased the leased property. The original lease between the lessee and the lessor included an option to purchase the leased property for $110,000, which, if it had been exercised, would have required payment of 6% of the purchase price to the referring real estate broker. The lessee did not exercise the option to purchase during the term of the lease, but continued to lease the property as a holdover tenant after the lease had expired. The lessee later purchased the property for $70,000—a price $40,000 less than the exercise price specified in the option provision of the original lease.[10] The court assumed, only for the sake of argument, that *Turcol* stood for the proposition that Delaware's holdover tenancy statute kept option provisions in force during holdover tenancies.[11] The court rejected the plaintiff-broker's arguments that the lessee had exercised its option to purchase and that the broker was entitled to 6% of the purchase price, holding that the broker would only be entitled to a fee if the lessee exercised the option on its stated terms. But the court's assumption regarding *Turcol* was only that—an assumption—and the court made no holding on the survival of lease provisions during holdover tenancies.[12]

Further, the *Turcol* and *Hickman* cases concerned language of predecessor statutes that differs from the language used in

---

**7.** 156 A. 501 (Del.Ch.1931).

**8.** 277 A.2d 688 (Del.Super.1971).

**9.** 156 A. at 504.

**10.** 277 A.2d at 689.

**11.** *Id.* at 690. The court noted, in relation to its assumption, that an underlying question—whether the term "stipulation" as used in the applicable statute properly included options to purchase—had been the subject of much dispute in other jurisdictions.

**12.** *Id.*

§ 5108. Put simply, to the extent that *Hickman* and *Turcol* bear on this case, it is because they contain dictum that could be read as leaning in the Batemans' direction. But that dictum is not supported by reasoning that has pertinence here, and it does not address the precise statute at issue here. The predecessor statutes both define the terms of holdover tenancies with explicit reference to the terminated lease, stating "all the stipulations of the *lease* shall continue in force...."[13] Since the *Hickman* and *Turcol* cases were decided, the broad term "lease" has been replaced with the seemingly narrower term "rental agreement," which had not been a statutorily defined term before it was adopted. Both the replacement of the term "lease" with the term "rental agreement" and the statutory definition of the term "rental agreement" were enacted one year after *Hickman* was decided.[14]

■ I therefore lack binding precedent, or even helpful persuasive precedent, on the interpretive issue before me. When the plain words of a statute do not resolve the question of how a statute applies to a given dispute and there is no useful precedent, the court must necessarily look for evidence of the legislature's intent in adopting the provision at issue and select the interpretation that best implements the legislature's policy goals.[15]

As is not unusual in Delaware, the parties have cited—and I have found—no legislative history specifically shedding light on the policy considerations underlying the General Assembly's enactment of § 5108. The holdover tenancy recognized in § 5108 is not an innovation unique to Delaware, however; it is a common provision in American landlord-tenant codes. Consequently, it is inferable that the General Assembly enacted § 5108 to serve the same general purposes recognized in American jurisprudence as animating other similar statutes from other states.[16] I therefore consider the public policy purposes that holdover tenancy statutes are generally created to address.

■ Historically, in our legal tradition, when tenants continued to occupy property beyond the expiration of a lease, landlords were entitled to treat holdover tenants as trespassers, or to summarily evict them.[17] The doctrine of "self-help" arose in the interest of landlords and incoming tenants, allowing landlords to promptly recover possession of leased property from tenants

---

13. Emphasis added.

14. *See* 58 Del. Laws c. 472 § 1.

15. *See, e.g. Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del.1985).
   To apply a statute the fundamental rule is to ascertain and give effect to the intent of the legislature. If the statute as a whole is unambiguous, there is no reasonable doubt as to the meaning of the words used and the Court's role is then limited to an application of the literal meaning of the words. However, it is undisputed that when a statute is ambiguous and its meaning may not be clearly ascertained, the Court must rely upon its methods of statutory interpretation and construction to arrive at what the legislature meant.
   (citations omitted).

16. *See, e.g., Hudson Farms, Inc. v. McGrellis*, 620 A.2d 215, 221 (Del.1993) (construing an ambiguous state statute based on legislative intent discerned, in part, by reference to the interpretation of similar statutes in other jurisdictions and recognition of the purposes underlying the adoption of such statutes); *Dooley v. Rhodes*, 135 A.2d 114, 116 (Del. 1957) ("[A statute] must be read in the light of its legislative history and of the legislative policy evidenced by other related statutes.").

17. *See* 4 Powell on Real Property § 17.06 at 17–86 (Michael Allen Wolfe, ed., 2002).

who held it improperly.[18] Not surprisingly, widespread use of "self-help" remedies led to concerns for the endangerment of persons and property, and breaches of the peace.[19] Statutory holdover tenancies emerged as a means of protecting tenants from self-help by landlords who were legally entitled to treat them as trespassers—that is, to keep people from being dumped out on the street.[20] Statutes such as § 5108 attempt to maintain the status quo of a tenant's occupancy and use of leased property for a short period of time during which a landlord can pursue summary eviction. This approach balances the policy objectives of permitting landlords and incoming tenants to recover possession of property in a timely fashion and permitting outgoing tenants to move out in an orderly manner, thereby "improv[ing] the prospects for preserving the public peace."[21] Holdover tenancies are therefore not intended to prolong the existence of legal rights between the landlord and tenant, such as rights of first refusal, that are otherwise unrelated to occupancy and use of property.

■ For purposes of public policy analysis, it is important to note that holdover tenancy statutes, such as § 5108, necessarily impinge upon the freedom of parties to contract—itself an important policy consideration of our state.[22] The statutory extension of a lease beyond its defined duration is essentially a legislatively-sanctioned mandatory reformation of a contract between private parties. Such statutory derogations of freedom of contract should not be expansively read, particularly when applicable statutory definitions seem to address narrow concerns. At issue here is an anti-homelessness provision of narrow import—permitting a tenant to occupy a leased property for thirty days after termination of a controlling lease. Accordingly, application of § 5108 to extend provisions of a rental agreement beyond their bargained-for term of duration—in derogation of freedom to contract—should disturb the contracting parties' negotiated agreement only to the limited extent necessary to advance the statute's purposes. The statutory definition of "rental agreement" under § 5102 therefore is best read as addressing only a narrow set of interests: those specifically concerning the "use and occupancy" of a rental unit.

By contrast, the effect of § 5108 that the Batemans seek, the statutory extension of a Right of First Refusal beyond the contractually-defined duration of its existence, impinges upon the freedom of parties to contract, but does not promote any sensible public policy purpose that § 5108 was intended to serve. Indeed, the broad application of § 5108 that the Batemans seek would more likely frustrate the public policy purpose that holdover tenancy statutes were designed to promote.

■ Unlike an option to purchase property, which an option holder can proactively exercise, a right of first refusal can be exercised only when the holder of property entertains an offer from a third party to

---

18. *See* Restatement (Second) of Property § 14.2 cmt. a (1977).

19. *See* Restatement (Second) of Property § 14.3 cmt. a (1977).

20. *See* Restatement (Second) of Property § 14.2 cmt. a (1977).

21. *See id.*

22. *See, e.g., State v. Tabasso Homes,* 28 A.2d 248, 252 (Del.Gen.Sess.1942) (" 'If there is one thing more than another which public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting' and that this freedom of contract shall not lightly be interfered with.") (quoting *Printing Co. v. Sampson,* L.R. 19 Eq. 462, 465 (1875)).

purchase the property. As a matter of commercial reality, the extension of a right of first refusal beyond the termination of the contract that conveyed that right makes little sense, given the ease with which the exercise of such a right could be frustrated. A landlord, having granted a right of first refusal in a terminated lease but wanting to sell her property to a third party, could simply kick out a holdover tenant at the earliest opportunity and sell the property one day later. The holdover tenant in such case would clearly have no rights after both the lease and the holdover tenancy had terminated, and the landlord would be free to sell the property as she wished. For this reason, extension of a right of first refusal into a holdover tenancy actually creates an incentive for landlords to evict holdover tenants as soon as possible. That is precisely the result that holdover tenancy statutes, such as § 5108, were designed to avoid.

The paramount public policy concern of extending provisions of a lease that concern the use and occupancy of property into a holdover tenancy, and the absence of any public policy concern served by the extension of obligations between a landlord and tenant that are unrelated to use an occupancy into a holdover tenancy, has been recognized in well-reasoned case law from other jurisdictions. In *Wanous v. Balaco*,[23] for example, the Supreme Court

of Illinois ruled that an option to purchase did not survive the termination of a lease and did not remain in force during a holdover tenancy. The court considered the relevance of lease provisions to the holdover tenancy, concluding that "[n]ot every provision in a written lease is made a part of a holdover tenancy—only those terms applicable to the new condition of things are so treated."[24]

Similarly, the Supreme Court of California in *Spaulding v. Yovino–Young*[25] held that, although a holdover tenancy must reasonably be construed as permitting former lessees to continue their tenancy on the same terms and conditions stated in a lease, it was not reasonable to assume the continuation of an option to purchase beyond the termination of the lease. Considering the implications of its ruling in light of ever-changing commercial realities, the court stated that "[w]hile a lessor may be content for a fixed time to be restricted to a fixed price for the sale of his property, it is another matter altogether to conclude that an option to purchase is to continue for an indefinite period under authority of a 'hold-over' tenancy...."[26]

The *Wanous* and *Spaulding* decisions both declined to treat provisions of leases that relate only to commercial relationships between landlords and tenants and provisions governing use and occupancy of leased property as equally applicable to

---

**23.** 412 Ill. 545, 107 N.E.2d 791 (1952).

**24.** *Id.* at 793 (citing *Weber v. Powers,* 213 Ill. 370, 72 N.E. 1070, 1076 (1904)). The *Wanous* court did not explain precisely what it meant by "new condition of things," although it did provide an example of a lease term—a power of attorney to confess judgment for rent due—that would not apply to a holdover tenancy. The court itself construed an option to purchase property as a lease term that was not applicable to "the new condition of things." For present purposes, the "new condition of things" in a holdover tenancy seemingly refers to an attenuation of the relation-

ship between the landlord and the tenant, but a maintenance of the status quo as between the tenant and the leased property as to the precise terms of use and occupancy as a renter. This reading is consistent with the *Wanous* court's usage and its treatment of legal rights unrelated to use and occupancy of leased property as inapplicable to a holdover tenancy.

**25.** 30 Cal.2d 138, 180 P.2d 691 (1947).

**26.** *Id.* at 694.

holdover tenancies, finding no policy reason for provisions that do not relate to use and occupancy to continue during a holdover tenancy. I find that reasoning persuasive. Admittedly, there are decisions from other state courts going in the opposite direction. But I find them to be less persuasive because they address distinguishable facts, and if applied in circumstances such as those in this case, would generate a perverse outcome.[27]

Finally, the relevance of cases that suggest all terms of a lease continue in force beyond termination of the lease and into a holdover tenancy has grown ever more tenuous, given the evolutionary trend of the Delaware Landlord–Tenant Code toward narrower application. Indeed, the most recent amendments to the Code, which took effect immediately after the Batemans first entered into their Lease, provide no survival of rights under a terminated lease, nor even an automatic holdover tenancy, for leases of commercial property.[28]

In sum, I find that the Batemans' Right of First Refusal did not survive the termination of their Lease on December 31, 2002. This finding is consistent with the relevant text in the applicable provisions of the Delaware Landlord–Tenant Code, and is the reading most faithful to the public policy concerns that the General Assembly most likely sought to address by the statutory creation of holdover tenancies. This finding is also consistent with the Delaware public policy strongly favoring the right of parties to contract, and not to interpret statutes in derogation of that right broadly.

### III. *Conclusion*

For the foregoing reasons, the defendants' motion for judgment on the pleadings is granted. The case is dismissed and the parties shall bear their own costs. IT IS SO ORDERED.

---

**27.** An example of such a decision, which the Batemans relied upon heavily, is the Wisconsin Supreme Court's decision in *Last v. Puehler.*, 19 Wis.2d 291, 120 N.W.2d 120 (1963). The *Last* court held that a right of first refusal contained in a lease would remain in effect during a year-to-year holdover tenancy, reasoning that the landlord, benefiting from the certainty of a year-to-year tenancy, must also incur the obligations of the expired lease. Likewise, a tenant who is bound from year-to-year should be bound as to the advantages, as well as the disadvantages, of the lease. But in that case, the applicable holdover tenancy statute converted the expired lease into a one-year holdover tenancy *at the election of the landlord.* In that statutory scheme, the court's reasoning makes sense as a matter of policy and as a matter of equity: because the landlord elected the holdover, he should not be permitted to reap the benefits of that election and not be burdened by its corresponding obligations. That reasoning is not pertinent when a landlord has no option of electing or rejecting the holdover tenancy, as is the case under § 5108 here. The holdover tenancy at issue here did not arise due to a conscious decision of a landlord who, after conducting a cost-benefit analysis, concluded that it would be better off with the certainty of a year-long extended lease. Instead, a mere month-to-month holdover tenancy was created by default by operation of § 5108.

**28.** *See* 70 Del. Laws c. 513. Title 25 Part III of the Delaware Code, previously titled "Landlord–Tenant Code," has been renamed "Residential Landlord–Tenant Code," and Part IV, titled "Commercial Leases," has been created. In accordance with 25 *Del. C.* § 5101(b), "[O]nly Chapter 57 of Title 25 and Part IV of Title 25 shall have any application to commercial rental agreements." Neither Chapter 57 nor Part IV of Title 25 provide for automatic extensions of commercial leases, or any rights analogous to those conferred upon residential tenants under 25 *Del. C.* § 5108.